May it please the court, I'm Sarah Monaghan, attorney for the appellants Nathan Griffith and Joseph Griffith. This case is an interlocutory appeal from the Western District Court of Arkansas' denial of qualified immunity to Nathan Griffith and Joseph Griffith in an excessive force claim in case number 17-2016. Pursuant to Eighth Circuit precedent, in deciding an interlocutory appeal from a denial of qualified immunity such as this, this court is constrained by the version of the facts that the district court assumed or likely assumed, to the extent that that version is not blatantly contradicted by the record. That is, no reasonable jury could believe it. Here, the facts, as the district court determined them to be, are clearly set out in pages 381-385 of the appendix, which is the district court's order. The appellee is not cited to any evidence in the record, which shows that those facts are blatantly contradicted by the record. Nor has the appellee even argued that any of those facts are blatantly in deciding qualified immunity on this appeal. Specifically, the version of the events, as the district court determined, are as follows. During the early morning hours of May 11th, 2016, City of Ozark Police Officer Nathan Griffith received a call for assistance from a Franklin County jailer, Nick James, requesting his assistance in moving an inmate named Cody Franklin from the general population to the detox cell so that he could be isolated from the other inmates because he had been starting fights and altercations with the other inmates in general population. Nathan Griffith arrived at the jail at approximately 1254 a.m. and he, along with Nick James, made repeated verbal requests to Mr. Franklin for Mr. Franklin to accompany them to the detox cell, all of which Mr. Franklin refused. Mr. Franklin refused to exit the general population cell and he actually tried to get the officers to come into the general population cell with him and fight him. At a point, Mr. Franklin grabbed hold of Nick James and pulled him into the general population cell with him. Nick James was able to get free and at that point, Mr. Franklin threw several items at Nick James, which struck him in the head. At that point, Mr. Franklin exited the cell. He slammed the door behind him and he said, I'm not going anywhere. At that point, there was a stand and Franklin made an aggressive move towards the officers and ended up on the ground with Nathan Griffith, who attempted to subdue him at that point. Mr. Franklin was able to push and kick and get Nathan Griffith off of him and it was at that point that Nathan Griffith fired his taser for the first time, striking Mr. Franklin. Mr. Franklin went to the ground. Officer Griffith ordered him to roll over and put his hands behind his back. Mr. Franklin did not comply with that order and he began to stand back up. Officer Griffith deployed the taser a second time, struck Mr. Franklin, went to the ground. Officer Griffith ordered him again to roll over, put his hands behind his back, and again, Mr. Franklin attempted to stand. Officer Griffith... Are we required to assume that Nathan Franklin also choked, excuse me, that Nathan Griffin choked Franklin to the point of unconsciousness at one point? There's been some vague allegations that Mr. Franklin was choked out. That, again, is very vague and that was alleged to occur after the taser deployments in the general population area. However, there is absolutely no evidence in the record that Nathan Griffith or Joseph Griffin choked Mr. Franklin. I thought there was. I thought another inmate said that. If not, where does that come from? There were unsworn statements presented by the appellate from other inmates which said that Mr. Franklin was choked after he fought through three taser deployments. However, there's no evidence specific to Nathan Griffith or Joseph Griffith that either one of them choked Mr. Franklin. I'm wondering, isn't the focus of this case really what happened after he got in the cell? Isn't that what this case is about, about trying to remove the handcuffs? Well, ultimately, that's how the case... Isn't that what this is about? Ultimately, that's... It's not a trick question. I mean... Ultimately, that's where the case ended up. Mr. Franklin, of course, after giving no assistance to the officers in getting into the detox cell, once he was inside the detox cell with the officers, the district court did determine that he continued to struggle... Is that where we have the video? Yes, Your Honor. We have video of what occurred immediately outside the detox cell and then, of course, what occurred inside the detox cell. Well, I mean, the video in the case covers... I mean, we could talk about testimony or affidavits from various people, but we, in this case, we have a video of really the pertinent events, don't we? The pertinent events that occurred inside the detox cell. Yeah, after they get him out of general population, all the way up to the point where he becomes unconscious and the officers leave and then they come back in, right? We do have video of what occurred there inside the detox cell and nothing in that video blatantly contradicts what the district court determined in the detox cell. The district court said that Mr. Franklin resisted the officers' attempts to remove the handcuffs and that he continuously struggled throughout their efforts. There's nothing in that video that blatantly contradicts that. In fact, the video supports that finding. What was the state of the record with respect to the reasons for wanting to remove the handcuffs? The indisputed testimony in the record was that the officers believed that the threat that was being presented by this situation was not neutralized until Mr. Franklin was left in the detox cell with the handcuffs removed. The officers articulated two reasons for that belief. Number one, being they thought he was a threat to officers who would have entered the cell, had to go into the cell later on with him. They thought that it was a possibility he could get the handcuffs around to the front of his body and use them as a weapon. How would he do that? Would he somehow get his arms underneath himself and get his hands in front of him? That was what the officers' belief was. And then secondly, the officers articulated that they thought there was a threat to Mr. Franklin if he were left in the detox cell handcuffed as he was. Is there anything in the record about how that's standard procedure, for instance, to remove handcuffs from prisoners in the detox cell? The only thing in the record is that the officers testified that they believed that was standard procedure. Well, those are good reasons. If, I mean, it seems to me this is really, to me, the crux of the case is whether the assuming those were reasonable things to try to do on the part of the officers, they were in this situation, whatever happened before, justified in using the force they used. Isn't that really what the case comes down to? Yes. And in analyzing... And there was a lot of evidence that he was struggling and continued to struggle. The evidence in the record is indisputable that he struggled. Those were the findings. That was what was determined by the district court. And we are bound by those findings, unless there's something in the record which blatantly contradicts that. And the record indisputably shows that Mr. Franklin was violent, aggressive, noncompliant. He fought the officers throughout the entire course of this incident. And that's what this court is bound by in determining whether or not qualified immunity applies. What's in the record with respect to the mode of the taser? These tasers have different modes, as I understand. In general population, when Nathan Griffith deployed the taser, he deployed it in dart mode, which is supposed to cause neuromuscular incapacitation to the suspect. And in the detox cell, the taser was applied in the drive stun mode, which this court has actually recognized is it causes de minimis injury, just discomfort. And this court in Brossard v. Jank has actually said that that's a de minimis use of force, which causes a de minimis injury. And so that, of course, goes to the objective reasonableness of the taser application in a detox cell. Do we have any cases that involve the use of the taser in drive stun mode against a suspect or an individual in handcuffs? Yes, Eighth Circuit case law, Brossard v. Jank. It involved two separate incidents involving the application of the taser. And in the second incident, it involved an encounter with three suspects who were brothers who had made threats to the officers. They were placed in handcuffs, and while they waited to be transported to jail, one of the brothers refused to move over in the back seat of the patrol car, which prompted the officer to deploy his taser in drive stun mode to ensure that suspect's compliance. And here this court found that that use of the taser in that circumstance was reasonable because it was a tense, standoff-like situation where the suspect was refusing to comply with the officer's commands, and the situation was tense and rapidly evolving. And that is the same type of situation that we have here in this case, tense, rapidly evolving circumstances where this suspect, Mr. Franklin, was behaving threateningly towards the officers, he was aggressive, he was violent. And like in Brossard, the officers needed an action that was prompt and designed to get a response. And that's what the application of the taser in the drive stun was for. There's all of the cases regarding multiple tasings in the Eighth Circuit support finding in this case that the application of the taser multiple times in circumstances that are tense and rapidly evolving is objectively reasonable. And it is said that when officers are dealing with a violent, non-compliant, and aggressive suspect, that is a rapidly evolving circumstance which justifies multiple applications of the taser if necessary. Specifically, Ryan V. Armstrong is very on point with the facts of this case with respect to what happened in the detox cell. In that case, in an effort to subdue a suspect who was violent and non-compliant and aggressive towards officers, the officers applied a taser to a suspect two times in the drive stun mode while multiple officers placed the weight of their bodies on the suspect who was in the prone position. And this court in that case determined that was an objectively reasonable use of force and noted the most important factor that supported the holding was the observation that Mr. Harrell, who was the suspect in that case, was actively resisting the extraction procedure and ignoring directives by the officer to lay down on his bunk and the officer's efforts to subdue him. And I'd like to reserve the remainder of my time for rebuttal. Very well. Thank you all. What I'd like to start with is I think Judge Holmes did an excellent job of boiling this case down to a single paragraph and really a single sentence. On page 400 of the appendix, Judge Holmes wrote, because Franklin was restrained while Sergeant Griffith tased him, he was unlikely to place the officers in danger of fear. However, they continued to tase him. This is, he is referring to the scenario that is captured on the video. First of all, his hands were cuffed behind his back, not in front of him. He is laying flat face down on a concrete floor with three officers on top of him. But they're trying to get the cuffs off. Yeah, I understand they're trying to get the cuffs off. So the question is, is that something that they could reasonably believe was necessary in the circumstances? I mean, I think this is where viewing the evidence in the most favorable light for my client, rather than applying what turned out to be deadly force, they could have chosen to simply lay on top of him until he gave out. And the, and Judge, I'll read some more of Judge Holmes' opinion. He notes that it's significant. And he's actually, in this paragraph, he's distinguishing the facts of this case from the Ryan case that Ms. Monahan just mentioned. However, Ryan is distinguishable. In Ryan, the detainee was tased in drive-stun mode before the officers placed restraints on him. Conversely, Officer Griffith tased Franklin five times during the first altercation between Franklin and the officers in the hallway. Once Officer Griffith and Deputy James were able to place handcuffs on Franklin, Sergeant Griffith then tased Franklin another, he puts these, this in italics, three times in the isolation cell. But what has that got to do with what seems to me to the focus of the case is, and that is whether excessive force was used in the circumstances in the cell, whatever happened before? Well, it's, what happened before is, according to the state medical examiner who ruled this a homicide, is there's a difference between being able to survive being tased one time and being able to survive being tased eight times, and other, particularly with other aggravating factors such as your ability to breathe being inhibited, having been engaged in an altercation and having your heart rate up. So part of testimony from Sergeant Griffith, the one who delivered the lethal tases, is that when he enters the cell, he doesn't ask Officer Griffith, his cousin, or Deputy James, you know, have you all tased him before? And that's particularly relevant because the United States Department of Justice has issued promulgations and guidance for law enforcement officers wherein they've instructed that a taser should not be used until the applying officer has inquired with other present officers whether or not, whether or not there have been previous tases and how many. And also, those same promulgations limit the application of taser to three instances because if you've tased somebody three times and they're still not calming down, you know, the idea is use some other method of force besides that. But significantly, I think, too, we've got to look at, there's two ends of this balancing scale of what is excessive force. And the one end of it that I think we need to give attention to is on the, well, just how bad exactly was he behaving? And the absence of evidence that I think supports Judge Holmes' decision is there is no evidence whatsoever that any officer was ever injured. They testified. Nobody needed ibuprofen. Nobody needed a Band-Aid. Didn't the district court find, and the video bear out, that he continued to resist even though three officers were on top of him and he was handcuffed? And the question there is, so does this, quote, resisting, is that sufficient to justify the application of deadly force? I think that's exactly the question. And I believe that we need to, in considering that, look at the full scope of whether or not, because you've got to think, what are those officers thinking in that moment? You know, what is a reasonable man thinking? And so I'm making the point about that nobody suffered an injury. There's not even an allegation or any finding by the court that he ever threw a punch, that he ever pinched anyone. Boy, that's awful. After the fact hindsight kind of analysis. I mean, no one knows at the moment what's going to happen. Well, but, except that, these officers were actually there and present and experienced all of this. And... So you think the fact that they weren't injured... Well, I think the fact that when he was up and able to move around, and was not laying underneath three officers, that he didn't injure anyone when he was doing that, and these officers knew that, that that is, that applies to this balancing test of the reasonableness of their application of deadly force, when you've got a subdued victim versus, and knowing that even when he was up and walking around, and... How about the fact, and I think it's a fact, correct me if I'm wrong, that he was warned? The... The... I do not believe the finding that the district court found that Officer Joseph Griffith, the sergeant, that he warned him whenever he came into the room, and I don't think the It's obviously a very tragic case, but I'm wondering your characterization of it as the use of deadly force when, in truth and in fact, these kinds of tasers are used in circumstances very frequently, almost always, where death does not occur, isn't that correct? And in this particular mode, it's less, less likely to lead to serious injury, isn't that correct? Well, when it's used, when it's applied eight times, is one factor. Normally, when you're talking about normally, it doesn't result in death, that is not in a circumstance where it's... But they didn't know that, right? That he didn't know because he didn't ask. Well, I know. But the other officers, Officer Nathan Griffith that was there, he knew how many times he had been tasered, and there's even evidence that it may be greater than eight, because the autopsy report found evidence that there was a separate set of prongs that were applied to him, which in the officer's testimony, they never account for, which if there was another taser used, then that would necessarily mean a minimum of a ninth application. Now, moving to the clearly established prong, what's your best case out there that at this particular point in time, this right would have been clearly established? Well, I mean, he clearly has a right not to have excessive force applied against him. But the Supreme Court has repeatedly said, we're not supposed to take a generalized approach like that. It has to be specific to the facts of the case. So what's your best case where a guy is resisting, handcuffed... Yeah, I would cite to two cases, both Graham v. Connor and also the Shelton case, and as against nonviolent misdemeanors who do not flee or actively resist arrest and pose little or no threat to the security of officers or the public. However, force may be used if the individual was actively resisting the commands of law enforcement. But the critical point is, at the point that the three of them are on top of him in the video, I asked... I mean, this isn't something we have to wonder about. I asked Officer Sergeant Griffith in his deposition, you know, what kind of force was he applying that you were worried about getting injured? And he said, he was bending my fingers back. And this, the statements from counsel that he kept standing up, I mean, that's just simply not supported in the video that he's, while the three of them are on him and applying these cases that wound up being deadly, that he ever stands up. He's flailing. I'll agree to that.  He is flailing, I'm sorry. Yeah, he does, like, move his legs. But the actual officer who was there testified that the, that the, well, what was the greatest amount of resistance that you were worried about? He was bending my fingers back. Are those cases you just mentioned in your brief? They actually, one of them is cited in my brief, but the two of them I'm reading, I'm looking at Judge Holmes' opinion right here, it's at page 397 of the appendix. Okay, which, which one is in your brief? The, well, both the Ryan case and the Sheckleton case. Ryan against Armstrong? Yes. And what's the other one? It's Sheckleton. I'll give you a full cite for it. Well, that's okay, I just didn't see that one in your table of authorities in your brief, and that's why I wanted to know. Okay, it's a, the cite up here is 677 F. 3rd at 366. Are either, are these cases that you've cited, do they involve a prisoner in handcuffs resisting where officers are putting their body weight on the prisoner in an effort to remove handcuffs and apply a taser? No, and that's part of my point. Is, they, they involve inmates or suspects who were applying a greater degree of resistance than was, than was Mr. Franklin. The, I think, as I said, I think the entire case comes down to the sentence that I read to start, because, because Mr. Franklin was restrained while Sergeant Griffith tased him, he was unlikely to place the officers in danger of fear, however, they continued to tase him. And it led to his death. There's just no getting around that. Well, what do you, what do you say to the point that was made that leaving him in handcuffs could create a danger, not only to him, but to officers that might approach him later? I, I'm not sure that logically we can get to the idea that leaving a suspect laying on the floor in handcuffs is going to make an officer that comes along later in a greater degree of danger than the degree of danger he would be in if that same supposedly dangerous suspect was, was free to move about. What is the state of the record with respect to the possibility that he might have gotten his hands in front of him? There's, first of all, there's a video, and no, all three of these officers testified and agreed that the, that he was effectively handcuffed with his hands behind him. I understand that, but I mean, I don't, I mean, physically, I mean, you were talking about logic, I think you were saying, is it, but I'm wondering, is it physically possible for him to have done that? None of these officers, these officers are given an opportunity, and none of them testified that the reason they did this, they were worried that he was going to somehow jump through his arms. I thought that was in the record as one of the reasons, in addition to having a fear that he might hurt himself because he would lose his balance and fall over. I mean, I agree with you, it seems to me that on the face of it, a person who's, who's not handcuffed is more dangerous than one that's, that is, unless, unless he can use those handcuffs as a weapon. And I believe that was part of the difficulty that the record suggests. None of these officers testified that they were concerned that he was, that he was not effectively restrained with his hands behind his back. Okay, that's, that's not my question, but never mind. Yeah, well, I mean, it's, your, your theory, just nobody, none of the, I mean, counsel may have, but none of these witnesses in their hours of deposition testimony testified that the reason that they wanted to remove his handcuffs is because they were afraid he was going to be a greater danger laying face down with handcuffs behind his back than he would be up free to move about. What did they say the reason was? They said that it was the policy of the department. And the key is to, it's not a choice of, do you leave this guy, you know, with his handcuffs behind his back forever? Or do you tase him a seventh, eighth, maybe even ninth time to the point that he dies? You know, you know, they had the choice to walk out, let him calm down. They had the choice for the three of them to lay, stay there with their weight on top of him without repeatedly tasing him until he gave out. Did the officers, were they on notice that he was under the influence of methamphetamine? They were not. What did they know about his condition, about his violent condition or resisting, a condition of resisting or non-communicative? What did they know? They, they, all I can tell you is what they testified to what they saw, which was, it's described by one of the deputies as a scuffle in terms of the violence that he exerted in the general population unit. And they, there's a conflict in the testimony between Officer Griffith and Deputy James, one of whom says that, they says that they drug him on the mat, so therefore he was either unconscious or completely compliant because, you know, you can't pull somebody on a mat while you're fighting with him. But then in that same period of time, Officer Griffith says he was resisting while they were pulling him down the mat, down the hallway. But yeah, they wouldn't have had, they wouldn't have known anything about the non-lethal amount of methamphetamine that was in his system, which the state medical examiner found was, was not sufficient to cause death. In fact, he, the, the, the amount was within even a clinical range in a, in one of the three treatises that he, that he testified from. Mr. Gaston, your time's expired. Thank you. Thank you. Ms. Monaghan, rebuttal. On page 386 of the appendix in the district court's order, the district court did note that Mr. Franklin was warned in the detox cell before Joseph Griffith applied the taser in the drive-stun mode. He was what? He was warned before the taser was applied in the detox cell. Both Nathan Griffith and Officer Griffith did testify that they had the concerns about the handcuffs being used as a weapon and that they were concerned about the threat to Mr. Franklin. That testimony is throughout the record in the appendix and I believe it's also noted in Nathan Griffith's incident report. And the, the record will show that they testified about that on that point. You heard, go ahead. You heard Mr. Gaston tell us about the two cases he thought made this clearly established violation. Do you agree with him or not and why? No. The case law relevant to tense, rapidly evolving circumstances such as the case that we have here where the suspect was violent, aggressive, and noncompliant all overwhelmingly hold that multiple applications of the taser is objectively reasonable. According to Ryan, even if the suspect is subdued face down in the prone position and according to Brossert and according to LaCrosse, even if the suspect is handcuffed. There is no case factually on point that holds that the force applied by Officer, by Nathan Griffith and Joseph Griffith in applying the taser in this incident was objectively unreasonable. And in fact, all of the cases hold, all the factually on point cases involving Ryan, Brossert, Dubois, LaCrosse, all of those cases hold, or all of those cases support a finding that Nathan Griffith and Joseph Griffith's application of the taser in this situation was objectively reasonable at every point. Shackleton did not involve a violent noncompliant suspect. In Shackleton, he was a compliant, non-fleeing, non-violent misdemeanant. And that case is not applicable to a case such as this. Who's got the burden of proof on the question of whether the law is clearly established? The appellee has the burden of proof. Did the district court put the burden of proof on the right party here? Wherever the district court put the burden, the district court got it wrong. The clearly established law overwhelmingly shows this was, it's clearly established that it was objectively reasonable. And the case, again, cited by the district court, Shackleton, is not applicable here. Thank you. Ms. Monahan, Ms. Gaston, we appreciate your appearance today. An argument case will be submitted and decided in due course.